Laura B. Josephs
Donald N. Dowie (Trial Counsel)
Thomas D.Silverstein
Darcy Flynn
Daniel A. Weinstein
Thomas McAndrews
SECURITIES AND EXCHANGE COMMISSION
450 Fifth Street, NW
Washington, D.C. 20549-0911
(202) 942-4660 (Dowie)
(202) 942-9569 (Fax)
Email: dowied@SEC.gov
Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil No. |
| | ) | **COMPLAINT** |
| ROBERT GOEHRING, | ) ) ) ) | |
| Defendant. | ) | |

Plaintiff, the United States Securities and Exchange Commission, alleges as

follows:

## NATURE OF THE ACTION

1.     This action arises from defendant Robert Goehring's brazen violations of the

federal insider trading laws.  Specifically, Goehring traded in the stock of his employer,

Gerber Scientific, Inc. ("Gerber"), nine times between July 1998 and April 2000 on the

basis of material, nonpublic information he obtained in the course of his employment as Gerber's Director of Corporate Communications.  Goehring executed his first illegal trade barely two months into his tenure at Gerber, and during his three years at the company he enjoyed profits and avoided losses of $94,016 from his illicit stock transactions.

2.      In addition, Goehring tipped his close friend, Armund Ek, who was not employed at Gerber, with material, non-public information about Gerber.  Ek bought and sold Gerber stock based on these tips.  Ek had profits and avoided losses totaling $11,453 as a result of his trading.

3.      By engaging in insider trading and by tipping his friend Ek with material, non-public information about Gerber as described in this Complaint, Goehring violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. 240.10b-5].

4.      Accordingly, the Commission seeks a judgment:  (1) permanently enjoining defendant Goehring under Sections 21(d)(1) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(e)] from further violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;  (2) requiring him to disgorge the illicit profits and losses avoided from his own trades and those of his tippee's, with prejudgment interest under the Court's inherent equitable powers; (3) imposing monetary penalties against him under Section 21A of the Exchange Act [15 U.S.C. § 78u-1] for his illegal trading and tipping; and (4) permanently barring Goehring under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that

is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## JURISDICTION and VENUE

5.     This Court has jurisdiction over this action under Sections 21(d)(1), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(e), 78u-1 and 78aa].  Venue is proper under Section 27 of the Exchange Act because certain of the transactions detailed below occurred in this district.

## DEFENDANT

6.     Defendant Robert Goehring, age 64, at all relevant times has resided in Glastonbury, Connecticut.  As detailed below, Goehring worked at Gerber's corporate headquarters in South Windsor, Connecticut as the Director of Corporate Communications during the relevant periods at issue.  In response to the SEC staff's questions about Goehring's trading activity in Gerber stock, Goehring invoked the Fifth Amendment's privilege against self-incrimination.  Goehring also refused on Fifth Amendment grounds to produce any documents.

## OTHER RELEVANT PERSON AND ENTITY

7.      Armund Ek was, at all relevant times, a close friend of Goehring and a former employer who resided in Somers, Connecticut.   Ek did not work for Gerber.

8.     Gerber, a Connecticut corporation, is a provider of sign-making, specialty graphics, apparel and flexible materials, and optical lens processing goods and services, operating through several subsidiaries.  At all relevant times, Gerber's stock was

registered with the Commission under Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)] and traded on the New York Stock Exchange.

## FACTS

9.      In April 1998, Goehring accepted a position as Gerber's Director of Corporate Communications.

10.      As Gerber's Director of Corporate Communications, Goehring reported directly to Gerber's president and chief executive officer.  Goehring's duties included helping prepare company press releases – including those announcing earnings and other material corporate developments – and serving as the company's investor relations contact.  He also assisted in the preparation of the company's annual report, coordinated conferences with securities analysts, and dealt with the news media.

11.      While serving as Director of Corporate Communications, Goehring regularly obtained material, non-public information about Gerber.  As a member of Gerber's management-leadership team, Goehring attended officers' meetings where material, non-public information about Gerber was discussed, including earnings, earnings forecasts, budget strategies, operating reviews, and merger and acquisition activity.  In addition, beginning in November 1998, Goehring received confidential monthly letters which Gerber's subsidiaries sent to Gerber's president and CEO.  These letters routinely contained earnings, earnings projections, and other material, non-public information about Gerber.  Goehring also saw packets containing material, non-public financial information before they were sent to members of the board of directors, and helped prepare the presentations which Gerber's officers made to the board.  Further, Goehring

obtained material, non-public information for use in drafting press releases.  Finally, the individual offices of Gerber's management leadership — which included Goehring — were in close proximity.  In particular, Goehring had daily contact with the company's CEO, and dealt with the CFO on a routine basis.  In addition, he was friends with and frequently interacted with the company's Director of Corporate Development, who was responsible for mergers and acquisitions.

12.     At the Gerber officers' meetings, Gerber's general counsel routinely stressed that there was not to be any trading of Gerber stock based on inside information, and that members of the management- leadership team should consult with him before electing to trade in Gerber stock.  In addition, general counsel would state at relevant times in such meetings that after the end of a fiscal quarter until 48 hours after the end-of-quarter press release had been issued, there was not to be any trading in Gerber stock.

13.     Because of his position with Gerber, Goehring owed a fiduciary duty, or other duty of trust or confidence owed directly, indirectly or derivatively to Gerber and its shareholders.  This included a duty to not trade Gerber shares on the basis of material, non-public information and to not communicate such information improperly to others.

**Goehring Buys Gerber Stock on the Basis of Material, Non-Public Information Ahead of Gerber's Quarterly Earnings Announcement, and Tips His Friend Ek, Who Also Buys**

14.     On June 16, 1998, Gerber's leadership management group held a meeting to discuss, among other items, that quarter's outlook, including orders, sales and income.

15.     Goehring, according to his routine, would have attended that meeting.

16.     A Gerber board of directors meeting was scheduled for the end of June 1998. One of Goehring's duties was to review the packets sent to the board members.  These packets contained confidential company financial information.

17.     Goehring also was required to help prepare any presentations to be given to the board by the company's officers.

18.     In his position as the Director of Corporate Communications, Goehring learned no later than July 1, 1998 of material, non-public information indicating that Gerber would likely experience an earnings increase for the quarter ending July 31, 1998, which was the company's first quarter for the 1999 fiscal year.  This earnings information was material and non-public.

19.     On July 1, 1998, barely two months into his new job, Goehring purchased 600 shares of Gerber stock at $22.625 per share on the basis of the material, non-public information about these anticipated first quarter earnings, and in knowing or reckless breach of his fiduciary duty or other duty of trust or confidence owed to Gerber and its shareholders.

20.     This was the first stock transaction Goehring had initiated in more than a year. He had never before purchased Gerber stock.

21.     Goehring executed his purchase of Gerber stock (a) knowing that he was trading on the basis of material, non-public information, or (b) with reckless disregard as to whether the information on which he made the stock purchase was material and non-public.

22.     Soon thereafter, and prior to July 22, 1998, Goehring communicated Gerber's anticipated first quarter earnings information to Ek with the intent of conferring a benefit on Eck.

23.     Goehring knew or was reckless in not knowing the information he disclosed to Ek was material, nonpublic information, and that his disclosure of the information was improper and in breach of the above-described duties he owed to Gerber and its shareholders.

24.     Goehring and Ek had known one another since 1992 and were close friends. They and their spouses frequently socialized, and even vacationed together at the Ek's Florida home.  When Goehring lost his job in 1996, Ek employed Goehring as a consultant for two years in Ek's privately held company, until Goehring landed his position at Gerber.

25.     Goehring received a personal benefit when he tipped Ek because the tip provided a means by which he repaid Ek for Ek's having hired him when Goehring needed a job, and because Ek was a close friend.

26.     On July 22, 1998, Ek — who had never before bought Gerber stock — purchased 1,000 shares of Gerber stock at $27.875 per share on the basis of the material, non-public information Goehring had tipped to him about Gerber's anticipated first-quarter earnings.

27.     On August 20, 1998, Gerber publicly announced sharply higher income, including figures showing that earnings per share had increased 93% for the quarter ended July 31, 1998, even before accounting for a one-time gain for the quarter.  The price of Gerber stock closed that day at $28.50, up $0.8125 from the previous day's close.

7

28.     Based on the August 20 closing price, Goehring and Ek enjoyed profits of $3,525 and $640 respectively from their trades.  To lock in his profit, Goehring sold the shares three weeks later on September 11, 1998 for actual profits of $2,025.

**Goehring Buys Another 600 Shares in Advance of Gerber's November 19, 1998 Press Release**

29.     On September 14, 1998, Gerber held an officer's meeting where the agenda items for the September 25, 1998 board of directors meeting were discussed.  In addition, the CFO discussed the second-quarter and fiscal-year outlook.  Goehring attended the meeting.

30.     One of Goehring's duties was to review the packets sent to the board members in advance of the meeting.  These packets contained confidential company financial information.

31.     Goehring also was required to help prepare any presentations to be given to the board by the company's officers.

32.     Part of the board's agenda for the September 25 meeting was whether to approve a buy-back of 3,000,000 shares of Gerber stock.

33.     On September 25, 1998, Gerber's board voted to repurchase 3,000,000 shares of stock.  This information was material and non-public.

34.     Prior to October 29, 1998, Goehring learned about the company's stock buy-back. This information was material and non-public.

35.     On October 29, 1998, just two days before the second quarter of Gerber's fiscal 1999 year ended, Goehring purchased 600 shares of Gerber stock at an average price of $19.79 per share on the basis of the material, non-public information about Gerber's

anticipated stock repurchase, and in knowing or reckless breach of his fiduciary duty or other duty of trust or confidence owed to Gerber and its shareholders.

36.     Goehring executed this purchase of Gerber stock (a) knowing that he was trading on the basis of material, non-public information, or (b) with reckless disregard as to whether the information on which he made the stock purchase was material and non-public.

37.     On November 19, 1998, Gerber issued a press release which Goehring helped prepare.  The press release announced that Gerber would repurchase the 3,000,000 shares of stock, and that the company had enjoyed a 41% earnings increase over the same quarter for the previous year for the company's second quarter ended October 31, 1998. Gerber stock closed that day at $23.93 per share, up nearly four dollars from the prior day's close of $20.25.

38.     Based on the November 19 closing price, Goehring enjoyed profits of $2,488.50 from his October 29 trade.  To lock in his gains, Goehring sold the shares four days after Gerber issued the press release, for actual profits of $3,201.

39.     When SEC staff questioned Goehring about this trade, Goehring invoked the Fifth Amendment's privilege against self incrimination.

**Goehring Buys 2,000 Shares in Advance of Gerber's May 27, 1999 Earnings Release**

40.     On May 19, 1999, following the end of Gerber's fiscal year (ended April 30, 1999), but before Gerber had announced its year-end earnings, Goehring purchased 2,000 shares of Gerber stock at $20.12 per share.  This was the company's end-of-quarter "quiet

period," during which Gerber's general counsel routinely stated at leadership-management meetings that there was to be no trading in Gerber stock.

41.     Within 10 days of the end of the quarter, Gerber's subsidiaries routinely provided their end-of-quarter financial information to Gerber's corporate headquarters where Goehring worked.

42.     Before he made the May 19 purchase, Goehring had learned of information indicating that the company would experience increased earnings for its fourth quarter and for the fiscal year ended April 30, and that it would likely be at the top of its expected earnings range at $1.29 per share.  This information about Gerber's earnings was material and non-public.

43.     Goehring purchased the 2,000 shares of Gerber stock on the basis of the material, non-public information about Gerber's fourth quarter and year-end earnings, and in knowing or reckless breach of his fiduciary duty or other duty of trust or confidence owed to Gerber and its shareholders.

44.     Goehring executed this purchase of Gerber stock (a) knowing that he was trading on the basis of material, non-public information, or (b) with reckless disregard as to whether the information on which he made the stock purchase was material and non-public.

45.     On May 27, 1999, Gerber announced its increased earnings for the quarter and the fiscal year ended April 30, 1999 in a press release Goehring would have helped prepare as part of his duties.  Gerber's CEO — Goehring's supervisor with whom Goehring had daily contact — stated in the release that strong earnings growth was expected for the

coming fiscal year.  Gerber's stock closed that day at $22.125 per share, up $1.125 from the previous day's close.

46.    Goehring made a $4,000 profit on his May 19 trade based on the May 27 closing price.

47.    When SEC staff questioned Goehring about this trade, Goehring invoked the Fifth Amendment's privilege against self incrimination.

**Goehring Buys 1,800 More Shares in Advance of Gerber's February 17, 2000 Earnings Release**

48.    After the close of Gerber's fiscal third quarter ended January 31, 2000, Goehring learned of material, non-public information indicating that Gerber would experience a material increase in earnings for the quarter.

49.     During the company's quiet period on February 11, 2000 — after the quarter ended but before Gerber announced its earnings — Goehring purchased 1,800 shares of Gerber stock on the basis of the material, non-public information about Gerber's third quarter earnings, and in knowing or reckless breach of his fiduciary duty or other duty of trust or confidence owed to Gerber and its shareholders.

50.    Goehring executed this purchase of Gerber stock (a) knowing that he was trading on the basis of material, non-public information, or (b) with reckless disregard as to whether the information on which he made the stock purchase was material and non-public.

51.    Less than one week later, on the morning of February 17, 2000, Gerber issued a press release announcing the earnings increase which Goehring would have helped

prepare as part of his duties.  Gerber's stock closed that day at $21.31 per share, up from the previous day's close of $20.50.

52.     Goehring again profited, this time in the amount of $2,363, based on the February 17 closing price.  Goehring locked in most of his gains the next day, selling the stock for an actual profit of $1,800.

53.     When SEC staff questioned Goehring about this trade, Goehring invoked the Fifth Amendment's privilege against self incrimination.

**Goehring Buys Additional Gerber Shares After Learning About a Non-Public E-Commerce Joint Venture and Tips Ek, Who Also Buys**

54.     In January 2000, Gerber began negotiating with another company about an on-line apparel venture.  Goehring's supervisor, Gerber's CEO, was involved from the beginning in the negotiations.  Goehring's personal friend, Gerber's Director of Corporate Development, was coordinating the meetings between Gerber and the other company.  Goehring received email and other correspondence concerning the anticipated venture, and knew about it no later than the end of January 2000.  The information about the venture was material and non-public.

55.     By February 22, 2000, Gerber had drafted a 'terms and conditions' document with signature blocks for the anticipated venture.  About that same time, Gerber's CEO directed Goehring to draft a press release announcing the venture.

56.     On February 23, 2000 Goehring purchased 1,800 shares of Gerber stock at $19.1875 per share on the basis of the material, non-public information about Gerber's anticipated joint venture, and in knowing or reckless breach of his fiduciary duty or other duty of trust or confidence owed to Gerber and its shareholders.

57.     Goehring executed this purchase of Gerber stock (a) knowing that he was trading on the basis of material, non-public information, or (b) with reckless disregard as to whether the information on which he made the stock purchase was material and non-public.

58.     On the weekend of February 25-27, 2000, Goehring and his wife visited the Eks at the Ek's vacation home in Florida.  After returning from this trip, Goehring telephoned Ek on March 1, 2000 and the two spoke again.  During one or more of these times, Goehring tipped Ek about the material, non-public information regarding the Gerber joint venture with the intent of conferring a benefit on Eck, and in breach of Goehring's fiduciary duty or other duty of trust or confidence owed to Gerber and its shareholders.

59.     Goehring knew or was reckless in not knowing that the information he disclosed to Ek was nonpublic and that his disclosure of the information was improper and in breach of the duties he owed to Gerber and its shareholders.

60.     Goehring received a personal benefit by tipping Ek because the tip provided a means by which he repaid Ek for Ek's having previously hired him when Goehring needed a job, and because Ek was a close friend.

61.      The next morning, on March 2, 2000, Goehring and Ek each bought Gerber stock within 15 minutes of one another.

62.     Specifically, Goehring purchased 2,200 shares of Gerber stock at an average price of $15.0625 per share in knowing or reckless breach of his fiduciary duty or other duty of trust or confidence owed to Gerber and its shareholders.  Ek bought 1,000 shares at $14.9375 per share based on the tip from Goehring.

63.    Goehring executed his purchase of 2,200 shares of Gerber stock (a) knowing that he was trading on the basis of material, non-public information, or (b) with reckless disregard as to whether the information on which he made the stock purchase was material and non-public.

64.    On March 3, 2000, Goehring purchased yet another 2,000 shares of Gerber stock, this time at an average price of $16.25 per share and in knowing or reckless breach of his fiduciary duty or other duty of trust or confidence owed to Gerber and its shareholders.

65.     Goehring executed his purchase of the 2,000 shares of Gerber stock (a) knowing that he was trading on the basis of material, non-public information, or (b) with reckless disregard as to whether the information on which he made the stock purchase was material and non-public.

66.    On March 7, 2000, in a press release Goehring helped prepare, Gerber publicly announced the plan to form the on-line apparel venture.  Gerber's stock rose to $17.4375 at the close of trading, up $.09375 from the previous day's close.

67.    Based on the Gerber stock closing price on March 7, 2000, Goehring had profits of $7,600 on his February 23, March 2 and March 3 trades, while Ek had a $2,500 profit from his trade.

68.    When SEC staff questioned Goehring about his February 23, March 2 and March 3 trades, Goehring invoked the Fifth Amendment's privilege against self incrimination. Goehring also invoked the Fifth Amendment in response to questions about whether he had tipped Ek in advance of Ek's March 2 trade.

**Goehring and Ek Jettison Their Shares in Advance of Gerber's April 26, 2000 Announcement of Lowered Earnings**

69.     Before March 23, 2000, Goehring learned that Gerber likely would miss earnings expectations for the year and for the fourth quarter ended April 30, 2000.  Goehring had received information stating that January revenues for Gerber's largest subsidiary, GSP, were below the company's expectations by $900,000, and that revenues were still lagging in February.  Similarly, the Gerber Tech subsidiary reported on March 14, 2000 that its revenues were below the company's plan by more than $5,000,000.  On March 10, 2000, the Gerber Coburn subsidiary reported significant order shortfalls and operating losses. This was material, non-public information which Godden received on a routine basis.

70.     According to his regular routine, Goehring also would have attended the quarterly reviews with each of the subsidiaries the first week of March, where material negative financial information for the subsidiaries was discussed.

71.     From March 20 through March 22, 2000, Goehring's administrative assistant was assembling packets for Gerber's March 30, 2000 board meeting.   One of Goehring's duties was to review the packets before they were mailed to the board members.  The packets, mailed on March 22, showed a material reduction in the company's expected earnings per share for the quarter ended April 30, 2000.

72.     On March 23, 2000, Goehring liquidated his entire position in Gerber based on the material, inside information about Gerber's financial shortfalls, selling all 6,000 of his shares at $20.5625 in knowing or reckless breach of his fiduciary duty or other duty of trust or confidence owed to Gerber and its shareholders.

73.     Goehring executed his sale of Gerber stock (a) knowing that he was trading on the basis of material, non-public information, or (b) with reckless disregard as to whether the information on which he made the stock sale was material and non-public.

74.     Prior to March 24, 2000, Goehring communicated the material, non-public negative earnings information to Ek with the intent of conferring a benefit on Eck and in breach of Goehring's fiduciary duty or other duty of trust or confidence owed to Gerber and its shareholders.

75.     Goehring knew or was reckless in not knowing that the information he disclosed to Ek was material, nonpublic information and that his disclosure of the information was improper and in breach of the duties he owed to Gerber and its shareholders.

76.     Goehring received a personal benefit by tipping Ek because the tip provided a means by which he repaid Ek for Ek's having previously hired him when Goehring needed a job, and because Ek was a close friend.

77.     Based on Goehring's tip, Ek — like Goehring — liquidated his entire position in Gerber, selling all 1,000 of his Gerber shares on March 24, 2000.

78.     On April 26, 2000, Gerber announced that its fourth quarter results would likely be lower than expected.  Gerber's stock price closed that day at $11.50 per share, down $3.63 from the previous day's close.  Goehring thus avoided losses of $54,375 by selling his 6,000 shares on March 23.  His friend and tippee avoided losses of $8,314 by selling the following day, on March 24.

79.     When SEC staff questioned Goehring about his March 23 trade, Goehring invoked the Fifth Amendment's privilege against self incrimination.  Goehring also

invoked the Fifth Amendment in response to questions about whether he had tipped Ek in advance of Ek's March 24 trade.

**Goehring Sells Short Based on the Negative Financial Information**

80.     On March 27, 2000, Gerber's CFO gave a presentation to Gerber's management-leadership group, where the CFO explained that earnings per share for the fourth quarter and the fiscal year ended April 30, 2000 could be even lower than previously expected. Goehring routinely attended such meetings.  This was material, non-public information.

81.     On April 12, 2000, Goehring, for the first time, sold short 3,000 shares of Gerber stock.  Goehring made the sale based on the material, non-public, negative financial information detailed in paragraphs 69-71 and 80.  He sold the stock at $18.18 per share in knowing or reckless breach of his fiduciary duty or other duty of trust or confidence owed to Gerber and its shareholders.

82.      Goehring executed his short sale of Gerber stock (a) knowing that he was trading on the basis of material, non-public information, or (b) with reckless disregard as to whether the information on which he made the short sale was material and non-public.

83.     As stated above, on April 26, 2000, Gerber announced that its fourth quarter results would likely be lower than expected.  On that day, Gerber's stock price dropped 25% to $11.50 per share, a decline of $3.9375 from the previous day's closing price of $15.4375.  On April 26, Goehring purchased 3,000 shares of Gerber stock at $11.625 per share to cover his short position.  As a result, Goehring realized profits of $19,665 from his short sale.

84.     When SEC staff questioned Goehring about his short sale, Goehring invoked the

Fifth Amendment's privilege against self incrimination.

**CLAIM FOR RELIEF — Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

85.    The SEC incorporates the allegations in paragraphs 1 through 84 of this Complaint as though fully set forth in this paragraph.

86.    As detailed above in this Complaint, Goehring, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or the facilities of a national securities exchange, and/or the mails: (a) employed devices, schemes, and/or artifices to defraud;  (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated  or would have operated as a fraud or deceit on other persons in violation of Exchange Act Section 10(b) and Exchange Act Rule 10b-5.

87.    Goehring will, unless restrained and enjoined, continue to engage in the transactions, acts, practices and courses of conduct alleged in this complaint, or in similar transactions, acts, practices and courses of conduct, in violation of the federal securities laws.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter judgment:

a.    permanently enjoining Goehring, his agents, servants, employees, representatives, attorneys, affiliates and all persons in active concert or participation with them who

receive actual notice of the Court's permanent injunction, from future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

b.      imposing monetary penalties against Goehring under Section 21A of the Exchange Act based on his inside trades and his tipping;

c.      ordering Goehring to disgorge the illicit profits and losses he avoided from the unlawful trading alleged in this complaint, and prejudgment interest thereon;

d.      ordering Goehring to disgorge the illicit profits and losses his tippee avoided as a result of the unlawful trading alleged in this complaint;

e.      prohibiting Goehring under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

f.      granting the Commission such further relief as justice requires.

_____
Laura B. Josephs
Donald N. Dowie (Trial Counsel)
Thomas D. Silverstein
Darcy Flynn
Daniel Weinstein
Thomas McAndrews
SECURITIES AND EXCHANGE COMMISSION
450 Fifth Street, NW
Washington, D.C. 20549-0911
(202) 942-4660 (Dowie)
(202) 942-9569 (Fax)
Email: dowied@SEC.gov
Counsel for Plaintiff

_____
John B. Hughes (CT05289)
United States Attorney's Office
New Haven Office
Connecticut Financial Center
157 Church St., 23rd Floor
New Haven, CT 06510
(203) 821-3700
Fax: (203) 773-5376
Local Counsel for Plaintiff